# EXHIBIT 1

1

**THOMAS C. GOLDMAN, M.D.**
**PSYCHIATRY & PSYCHANALYSIS**
4701 WILLARD AVENUE, SUITE 212
CHEVY CHASE, MD 20815
TEL. 301 718 5108 or 202 285 8869
FAX 301 652 0460
e-mail: tgoldmanmd@gmail.com

July 3, 2018

Ari S. Casper
Managing Partner                              Re: Keandra Jackson
The Casper Law Firm                           D.O.B. 6/20/1991
1310 L Street N.W., #800
Washington, DC 20005

Dear Mr. Casper

This report is an addendum to my previous report dated March 5, 2018, which was relatively brief due to time pressure. I had the opportunity to re-examine Ms. Jackson at my office on June 27 for two hours. In the time interval since the first report I have also had the opportunity to review the report on Ms. Jackson prepared by Dr. Goldberg and Associates dated May 20, 2018. What I will say in this report is based upon my examinations of Ms. Jackson. While I will make reference to Dr. Goldberg's report, I did not base any of my professional opinions on it.

Ms. Jackson appeared and acted very much as she had on the first interview. She related a few details of her new job as a school bus driver for the District of Columbia, including that she liked the children, that her work schedule had been quite heavy until school was out, and that she expected a somewhat lighter load during summer school and until the new school year begins in August. She offered spontaneously that she was very relieved to be sufficiently far away from Mr. Queen that she would be unlikely to ever encounter him again. However, her anxiety continues to be triggered by reminders of Mr. Queen as, for example, seeing an automobile that resembles his. Reviewing the history of her employment at the D.C. Public Library, she repeated the narrative that she was reluctant to complain about Mr. Queen's egregious behavior at first due to her status as a new employee, but did report it to her immediate supervisor, Wendy, who advised her that other female employees had experienced similar harassment by Mr. Queen, with the implication that it was just part of the conditions of working at the library. Wendy advised her "brush it off". However, Ms. Jackson, as the bad behavior continued, was confirmed in the belief that Mr. Queen's behavior with female employees was outrageous and needed to be dealt with by management.

She related an incident in which Mr. Queen asked a male co-worker, Mr. Carter, "are you still fucking that bitch?" without the slightest evidence to indicate any such relationship. Carter argued back and then reported the incident to management. Ms. Jackson repeated some of the anecdotes reported in our first meeting, illustrating how Mr. Queen persisted in going out of his way to be in her presence. This resulted in her becoming concerned about his possibly finding out where she lived, "knowing what kind of a man he is".

Case 1:17-cv-01814-CKK Document 25-1 Filed 07/05/18 Page 3 of 4
07/05/2018 11:42AM 3016520460 MORRISON & GOLDMAN PAGE 03/04

2

In response to my asking her how she was getting along, she reported, in a frank manner and with appropriate affect, that she had "had better days since I [first] spoke with you", but continued to have symptoms of significant stress including sleep disturbance. She has difficulty falling asleep before midnight even when she has to awaken at 4 AM to prepare for her driving shift. Previously she had been able to sleep from 8 PM to 5 AM. She continues to feel anxious in the evenings while home alone. She has had unpleasant dreams with content clearly related to horror and disgust at Mr. Queen. She has become somewhat phobic about going to the bathroom at night, finding that she cannot wash her hands and return to bed unless she turns on the light to make certain she is safe. She has to be certain that the TV programs she watches in the evening are "positive". She remains socially withdrawn, having ceased going out with her women friends except for a rare occasion, such as a baby shower, where she can reasonably expect not to meet men who might approach her for a date. Her feelings of disgust were sufficiently intense that she felt compelled to cut off most of her hair because it had been touched inappropriately by Mr. Queen. (This type of disgust about the body is very common among victims of rape and sexual harassment.)

She reported that she had never experienced this kind of aversion to physical touch previously. She related that at the time of her employment at the library she had been in a steady relationship with a man named Kareem. He initially responded to hearing about the workplace harassment with anger at Queen (whom he had never met) and offered to confront the man and "talk to him", which she felt, reasonably, would only create more problems including the threat of job loss. Although they had previously enjoyed intimate relations, as a result of the harassment by Queen she found herself feeling disgusted about any sexual contact and having to refuse to let him touch her. Although Kareem had tried to be patient and supportive, she could not tolerate physical contact and the relationship consequently ended. Currently her main social contact is her mother, to whom she speaks daily. She has given up roller skating, which she used to enjoy at a local indoor track with her women friends, and has not substituted any other vigorous physical activity, resulting in significant weight gain and self-discontent.

Ms. Jackson's demeanor and speech were unremarkable throughout the two hour examination. Her affect was entirely appropriate to the content of her narrative. She reports, credibly, that she still cries when talking to her friends on the phone, when subjects related to her previous job and her current withdrawn emotional state. She never appeared to be self-dramatizing or exaggerating her symptoms. In fact she was quite careful to give a balanced view of her current emotional state in that she admitted to feeling better in some respects—chiefly in areas related to work—than she had been while employed at the library. This made her reporting about her persisting symptoms—chiefly in the social and sexual areas and her persistent anxiety---quite credible.

Ms. Jackson discussed her unsuccessful attempts to get professional treatment for her emotional distress about the foregoing events despite considerable time and effort expended. She reports that she used the on-line provider list of her health insurance company (Aetna) but was unable to find a practitioner, either individual or a clinic—in her neighborhood in the Southeast section of Washington, where she lives (and where there is a relative paucity of providers). Searching in other parts of the DC area, she found a number of clinics and individual providers but found them not particularly helpful. Some providers said they were not currently accepting new patients. Another facility would not quote her a rate for their

services, but suggested she commit to a period of several months of sessions at the end of which they would give her some "quotes" about fees. Also, importantly, Ms. Jackson cannot afford the required treatment, even if part of it is paid for by her health insurance plan.

## DISCUSSION AND CONCLUSIONS

The history obtained and the observations made during my combined examinations were consistent with a diagnosis of Chronic Posttraumatic Stress Disorder (F43.10), a diagnosis which incorporates the lesser diagnosis of Adjustment Reaction with Mixed Disturbance of Emotions. This is a serious psychiatric disturbance which is clearly a result of the sexual harassment at her workplace as described above. In order to optimize her recovery, she needs to undergo individual psychotherapy, preferably at a frequency of twice weekly for at least part of the duration of treatment. Group therapy might also be employed in addition. Also, Ms. Jackson should be evaluated for treatment with psychotropic medication to be administered by a psychiatrist.

It is worth mentioning some points of comparison with the opinions expressed in the Goldberg report, which comes to the same diagnostic and causal conclusions. My opinion differs from those of Goldberg in several important respects: I did not see any evidence of Ms. Jackson over-reporting her symptoms. In fact she seemed to be downplaying them (which incidentally she said she had done during her deposition). Having examined numerous plaintiffs in similar cases, I found her reporting quite believable and consistent with established facts.

I cannot agree with the Goldberg contentions regarding Ms. Jackson's failure to get appropriate treatment in a timely way. In my experience, many people, and, in particular, many victims of sexual harassment, are not effective seekers of mental health treatment because of combined factors of shame and embarrassment and lack of assertiveness due to depressed mood. Additionally, many are not at all knowledgeable about mental health treatment and may feel that seeking it is a sign of being weak and/or "crazy". I also cannot agree with the Goldberg generalizations about the effectiveness of short-term treatment for PTSD. Dr. Goldberg asserts that it is readily available and effective. His experience appears to come exclusively from the military setting, where the model is short-term intervention to get the sufferer back into active duty as soon as possible and it is assumed that cases are more alike than different, allowing an approach that minimizes individual differences. Experience with the specific characteristics of sexual harassment, which is in the vast majority of cases about males with power harassing females without power, demonstrates that the issues it raises dig deep into sociocultural issues of gender identity, gender roles, and social class. Finally, the logic of the Goldberg report appears faulty at best, weighing heavily on the (false) idea that effective treatment, being universally available, thereby vitiates any claim of severe and long-term harm from workplace sexual harassment. Experience shows that this is unfortunately not true.

Please contact me if you need anything additional in this case.

Very truly yours,

Thomas C. Goldman, M.D.

Maryland License # D0008605